UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LUZ MERCADO; MAROLYN LA PAZ; ANNMARIE LAVINE,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO [and fictitious parties],<br><br>Defendants. | Civ. No. 15-4086 (KM-MAH)<br><br>OPINION |

The three plaintiffs, Luz Mercado, Marolyn La Paz, and Annmarie Lavine, were employees of a branch of Wells Fargo Bank (the "Bank") located on South Street in Morristown, New Jersey. They, as well as a fourth employee, David Bagley, were fired on May 1, 2013. The Bank told the employees it was dismissing them because they had opened accounts or issued debit cards without the customer's presence or authorization, and because Lavine and La Paz had falsified La Paz's employee time records. The plaintiffs assert that their dismissal was actually motivated by racial discrimination, and seek damages under the New Jersey Law Against Discrimination ("NJLAD"). Now before the Court is the Bank's motion for summary judgment (ECF no. 51).

Two factors are perhaps most critical. First, the plaintiffs were fired based on misconduct that was thoroughly investigated and contemporaneously documented as the basis for dismissal. Second, these three plaintiffs—two identified as Black, and one as Hispanic—were replaced. Three persons—two identified as Black, and one as Hispanic—were hired as their replacements. Under such circumstances, it is difficult to infer the necessary discriminatory

1

intent. And in fact the evidence gives rise to no such inference. For the reasons stated herein, the Bank's motion for summary judgment will be granted.

## I. PROCEDURAL BACKGROUND

Plaintiffs filed this state-law Complaint in New Jersey Superior Court on April 27, 2015. (ECF no. 1) Count 1 of the Complaint asserts claims under the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1 *et seq.*, that the plaintiffs were discriminatorily dismissed on the basis of race and age. Count 2 asserts that the plaintiffs' dismissal constituted a breach of contract. Count 3 asserts that the plaintiffs' dismissal breached the implied contractual covenant of good faith and fair dealing.[1]

On June 16, 2015, the Bank removed the case to federal court based on this Court's diversity jurisdiction. *See* 28 U.S.C. 1332(a). The notice of removal recites that the plaintiffs are citizens of New Jersey, that the Bank is a citizen of South Dakota, and that the amount in controversy exceeds $75,000.

The parties have engaged in fact discovery. On August 7, 2017, the Bank filed the motion for summary judgment (ECF no. 51) that is now before the Court. The plaintiffs filed a response (ECF no. 60), and the Bank filed a reply (ECF no. 65). The matter is fully briefed and ripe for decision.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of

---

[1] Counts 2 and 3, as well as the age discrimination component of Count 1, have now been dropped. *See* Section III.A, *infra.*

2

material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992).

The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). That shifting "evidentiary burden" is discussed in Section III.B.1, *infra*.

## III. ANALYSIS

### A. Age Discrimination and Breach of Contract

In response to the Bank's motion for summary judgment, the plaintiffs have consented to the dismissal of a majority of their claims. In particular, they have abandoned Count 1, insofar as it alleges an NJLAD claim of age discrimination; Count 2, which alleges breach of contract; and Count 3, which alleges breach of the implied contractual covenant of good faith and fair dealing. *See* Pl. Brf. 8 (concluding discussion of racial/ethic discrimination and stating "C. Plaintiffs abandon all other claims in the Complaint.")).

Those abandoned claims are therefore dismissed on consent, with prejudice.

### B. Racial or Ethnic Discrimination under the NJLAD

A single claim remains: the portion of the Count 1 NJLAD claim that alleges discriminatory dismissal on the basis of race. The remainder of this Opinion discusses that racial discrimination claim.

#### 1. Standard of proof – *McDonnell Douglas*

In discrimination cases, courts evaluate motions for summary judgment under the specialized burden-shifting regime set out in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). That framework, adopted from federal Title VII cases, applies where, as here, the plaintiff asserts an NJLAD claim that rests on circumstantial evidence of discrimination. *Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 447, 867 A.2d 1133, 1139 (2005) (applying *McDonnell Douglas* test to

NJLAD discrimination case); *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 209, 723 A.2d 944, 954 (1999) (same).

*McDonnell Douglas* divides the burden of production into three steps, shuttling between the plaintiff and the defendant.

**Step 1: The Prima Facie Case.** At the outset, the plaintiff must state a prima facie claim of discrimination. *Zive*, 182 N.J. at 447, 867 A.2d at 1139; see *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). To make out a prima facie case "in a [NJLAD discriminatory] discharge case, a plaintiff must prove that: (1) she[2] was in the protected group; (2) she was performing her job at a level that met her employer's legitimate expectations;[3] (3) she nevertheless was fired; and (4) the employer sought someone to perform the same work after she left." *Id.* at 450, 867 A.2d at 1141 (citing *Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575, 597, 538 A.2d 794, 805 (1988)).

**Step 2: Legitimate non-discriminatory reason for the termination.**

If the plaintiff states a *prima facie* case, the burden of production shifts to the defendant, which must articulate a legitimate, nondiscriminatory basis for the adverse employment action. *Zive*, 182 N.J. at 449, 867 A.2d at 1140 (citing *Clowes*, 109 N.J. at 596, 538 A.2d at 805).

**Step 3: Pretext.** Once the defendant has proffered a non-discriminatory reason, the burden of production shifts back to the plaintiff.

> In the third stage of the burden-shifting scheme, the burden of production shifts back to the employee to prove by a preponderance of the evidence that the reason articulated by the employer was merely a pretext for discrimination and not the true reason for the employment decision. . . . To prove pretext, a plaintiff may not simply show that the employer's reason was false but must also demonstrate that the employer was motivated by

---

[2] The plaintiffs here happen to be female. In quotations I will as necessary substitute the female pronoun when referring to a generic plaintiff.

[3] In a discriminatory refusal-to-hire case, the plaintiff's *qualifications* for the job play a more central role. In a discriminatory discharge case, the plaintiff already has been hired, and by hypothesis possesses the necessary qualifications. In that context, then, this element requires no more than a showing that the plaintiff had been "actually performing the job" satisfactorily. *Zive*, 182 N.J. at 454, 867 A.2d at 1143.

discriminatory intent. . . . That burden merges with the plaintiff's ultimate burden of persuading the court that she or he was subjected to intentional discrimination. . . .

Zive, 182 N.J. at 449–50, 867 A.2d at 1140–41 (citations omitted). That shifting burden of production, however, must always be applied with an eye to the ultimate issue on a summary judgment motion: whether the proffered evidence creates a genuine, material issue of fact for trial.[4]

### 2. *McDonnell-Douglas* standard applied to the evidence

#### a. *Prima facie case*

For purposes of this motion, the Bank does not dispute that the plaintiffs have made the minimal four-part *prima facie* showing required at *McDonnell-Douglas* step one.

First, the plaintiffs are members of a protected minority. Ms. Mercado and Ms. LaPaz, who hail from the Dominican Republic, identify themselves as Latina, or Hispanic. Ms. Lavine, who is from Barbados, identifies herself as Black. (*E.g.*, Pl. Brf. 5)[5] The District Manager who dismissed them, Ms. Adrienne Anzalone, is identified as racially Caucasian.

---

[4] The *McDonnell Douglas* burden-shifting regime was adopted in recognition of the difficulty of proving discriminatory intent. Of course, where direct evidence exists, a plaintiff may offer direct evidence of discriminatory intent, *i.e.*, "not only a hostility toward members of the employee's class, but also a direct causal connection between that hostility and the challenged employment decision." *Bergen Commercial Bank*, 157 N.J. at 207–08. Where the evidence is direct, the standard of proof is similarly straightforward: "[T]he quality of evidence required to survive a motion for summary judgment is that which if believed, proves [the] existence of [a] fact in issue without inference or presumption." *Sisler*, 723 A.2d 944, 954 (N.J. 1999). *See also Pray v. New Jersey Transit, Inc.*, No. A-3831-12T3, 2014 WL 684592, at *10 (N.J. Super. Ct. App. Div. Feb. 24, 2014) (drawing this distinction); *Kirschling v. Atl. City Bd. of Educ.*, 10 F.Supp.3d 587 (D.N.J. 2014) (same).

Here, however, no such direct evidence is proffered. There is, for example, no contention that the relevant decision maker ever expressed racial hostility. Hence, as is common, the plaintiffs have gone the indirect, *McDonnell Douglas* route.

[5] A caveat: Because discrimination is based on irrational and distasteful perceptions, a Court hearing a discrimination case must sometimes employ, or at least describe, distinctions that it does not endorse. Here is one statement of the plaintiffs' discrimination claim:

6

Second, all three plaintiffs held down their positions at the Bank for some period of time, without serious disciplinary or other problems.[6]

Third, they were fired.

And fourth, this firing was not merely the elimination of a position or positions; the Bank hired replacement employees.

No more is required to satisfy *McDonnell Douglas* step one as interpreted by *Zive, supra.*

### b. Nondiscriminatory reason for dismissal

With similar ease, the Bank meets its step two burden to articulate a legitimate, nondiscriminatory basis for the dismissal of the plaintiffs. It offers evidence of the following facts, which are not substantially contradicted.

Lavine was the Manager of the South Street store, and La Paz and Mercado were Personal Bankers there. (DSOMF ¶¶ 1, 2, 5, 7) On February 19, 2013, Anzalone, as District Manager, received a report from Sehrish Firdaus, the South Street Service Manager, of misconduct in the South Street branch. Firdaus reported (a) that Lavine was instructing the store's bankers to order debit cards for customers who had not requested them; (b) that bankers had

---

Ms. Mercado believed that Wells Fargo's reason for her termination was a pretext for racial discrimination against her as she was from the Dominican Republic. Ms. LaPaz believed that Wells Fargo's reason for her termination was a pretext for racial discrimination against her as she was also from the Dominican Republic. Ms. Lavine believed that Wells Fargo's reason for her termination was a pretext for racial discrimination against her as she was from Barbados.

(PSOMF ¶ 8) In their brief, the plaintiffs repeatedly refer to race as the basis for discrimination, stating, for example, that the Bank "purged the South Street Branch of persons of color (Latino and Black)." (Pl. Brf. 5)

The clear sense of plaintiffs' case is that they believe they are the victims of discrimination against persons who are Black or Hispanic/Latina. Although Hispanics may of course be of any race, I will adopt the plaintiffs' use of the term "racial" discrimination as a convenient description of their claims. True, plaintiffs identify their countries of origin as Barbados and the Dominican Republic, but they do not allude to any form of discrimination that is specific to those islands or countries; I therefore do not employ the term "ethnic" discrimination.

6  The Bank cites disciplinary action against La Paz and Mercado for tardiness (DSOMF ¶¶ 34–41), but does not appear to rely on it as a basis for dismissal.

7

opened bank accounts for employees of Company X who had not even arrived in the United States; and (c) that Lavine permitted La Paz to falsify her time records. (DSOMF ¶¶ 42–43, 61–71)

The Bank investigated, and then interviewed plaintiffs. (DSOMF ¶¶ 76–78, 79–94) The investigation confirmed to the Bank's satisfaction that (a) Lavine and La Paz had falsified time records (DSOMF ¶ 96); (b) that Mercado had issued four debit cards without customer consent (DSOMF ¶¶ 97–98); and (c) that Lavine, Mercado, and La Paz had all been involved in opening accounts for customers who were not even present in the U.S. (DSOMF ¶ 99). A fourth employee, Bagley, not a plaintiff here, was also found to have been involved. (*Id.*) Based on these actions in violation of company policy, the three plaintiffs, as well as Bagley, were dismissed on May 1, 2013. (DSOMF ¶¶ 100, 115)

The justification for the plaintiffs' dismissal, as proffered by the Bank, is a legitimate, nondiscriminatory one. NJLAD cases and other discrimination cases applying the *McDonnell Douglas* standard have recognized that an employer may legitimately and non-discriminatorily dismiss an employee for acts of dishonesty and violations of company policy. *See, e.g., Kremp v. Wachovia Bank, N.A.*, 451 F. App'x 151, 155-56 (3d Cir. 2011) ("ignoring company policy" against using certain accounts to reverse customer fees "was plainly a legitimate, nondiscriminatory reason for [the employee's] termination"); *Lopez v. Lopez*, 997 F. Supp. 2d 256, 270 (D.N.J. 2014) (plaintiff's "violations of [his employer, Verizon's] Code of Conduct" when, *inter alia*, he damaged his work station, constituted a "legitimate, non-discriminatory reason" for his termination) (McNulty, J.); *Lindsey v. Wachovia Bank*, No. 08-2506, 2009 WL 749655, at *2, 6 (D.N.J. Mar. 19, 2009) (plaintiff's falsification of bank records in violation of Wachovia's Code of Conduct and Ethics was a legitimate, nondiscriminatory reason for her termination); *Jason v. Showboat Hotel & Casino*, 329 N.J. Super. 295, 307 (App. Div. 2000) (plaintiff's "misconduct on the job" was a "legitimate, non-discriminatory reason for his termination").

8

The Bank submitted ample written evidence that the plaintiffs took on their positions with the clear understanding that they were at-will employees who could be terminated with or without cause. (DSOMF ¶¶ 9–14) The Bank submitted copies of training materials, the Wells Fargo's Code of Ethics & Business Conduct, and the Sales Quality Manual. All of these written policies and manuals outlaw the practices of which plaintiffs were accused. They warn that applicable sanctions would include termination. (DSOMF ¶¶ 17–33)

At any rate, nothing about the basis for dismissal suggests racial discrimination, and plaintiffs have abandoned any claim that the dismissals violated their contractual rights. The Bank's stated basis for dismissal was a legitimate, non-discriminatory one.

### c. *Pretext*

We come to the real issue. The plaintiffs assert that the ostensible basis for their dismissal is not the real one, but a pretext for racial discrimination.

At this third stage, the plaintiff can meet her burden of demonstrating pretext by either of two methods: (1) she can discredit defendant's stated reason (in the context of showing that discrimination was the real reason); or (2) she can offer evidence that discrimination was more likely than not a motivating or determinative factor in the adverse action. *See Romano v. Brown & Williamson Tobacco Corp.*, 284 N.J. Super. 543, 551 (App. Div. 1995) (NJLAD case, citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

If the plaintiff relies on the first method (discrediting the defendant's proffered reasons), she faces a demanding standard: she must present evidence that allows a factfinder "reasonably to infer that each of the employer's proffered non-discriminatory reasons...was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes*, 32 F.3d at 764 (internal quotations and citations omitted); *see also Romano*, 284 N.J. Super. at 551. The plaintiff "must show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

9

a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes*, 32 F.3d at 764; *accord El-Sioufi v. St. Peter's Univ. Hosp.*, 382 N.J. Super. 145, 173–74, 887 A.2d 1170, 1187 (App. Div. 2005) (NJLAD case, citing *Fuentes*).

Viewed through the lens of the first method, the plaintiffs' proofs fail to raise a triable issue that the Bank's basis for firing was so weak or unfounded that it could not have been the real reason. It was not a *post hoc* fabrication, but a contemporaneously documented basis for dismissal. The evidence is uncontradicted that the Bank received reports of irregularities in account openings and time records. It then conducted a thorough investigation, including interviews of the plaintiffs. ((DSOMF ¶¶ 76–78, 79–94) The investigation confirmed that Lavine and La Paz had falsified La Paz's time records (DSOMF ¶ 96); that Mercado and Bagley had between them issued seven debit cards to customers who had not ordered them (DSOMF ¶ 97-98); and that all three plaintiffs had been involved in opening the accounts without the presence or authorization of the account holders (DSOMF ¶ 99). At the time, the Bank identified the account openings and falsified time records as the reason for the dismissal.

The Bank submitted copies of training materials, the Wells Fargo's Code of Ethics & Business Conduct, and the Sales Quality Manual, all of which are written policies and manuals that outlaw the practices of which plaintiffs were accused. They warn that applicable sanctions would include termination. (DSOMF ¶¶ 17–33) The Bank thus could permissibly have viewed these as serious infractions. A bank need not condone the unauthorized opening of accounts and issuance of debit cards for persons who are not present in the United States. Nor need it countenance an employee's falsification of time records. In short, these are not insubstantial or technical pretexts for dismissal; the Bank legitimately viewed them as firing offenses. *See* Section II.B.2.b, *supra*, and cases cited.

10

The Bank's basis for dismissal "was specific, and substantiated by direct evidence. Thus, defendants' reason is distinguishable from the vague, conclusory or speculative reasons" cited in other cases. *Sanks-King v. Univ. of Med. & Dentistry of New Jersey*, No. A-3050-11T4, 2013 WL 3744098, at *8 (N.J. Super. Ct. App. Div. July 18, 2013) (contrasting, *e.g.*, *Iadimarco v. Runyon*, 190 F.3d 151, 166 (3d Cir. 1999), in which the court did not accept a defendant's bare assertion that plaintiff was "not the right person for the job").

The plaintiffs offer testimony that they had good reason for acting as they did, or that the unauthorized opening of accounts had been condoned before. They assert that, in previous years, customer accounts had been opened as an accommodation to "Company X," which periodically sent employees to the United States. Pre-opening the accounts, say plaintiffs, was an established means of ensuring that those employees' pay could be direct deposited when they arrived in the U.S.[7]

The evidence of the issuance of debit cards, too, is not substantially disputed. Plaintiffs deny that the Bank had a policy of *automatic* termination for issuance of fewer than three unauthorized debit cards. (PSOMF ¶ 9)[8] Neither, however, did the Bank's policies insulate them from such a dismissal. Dismissal was surely an available sanction for even a single such violation of Bank policies. (*See* DSOMF ¶¶ 23, 26, 27.)

Plaintiffs do not really deny the falsification of time records; rather, they say that it was justified by the desire to make up for other hours worked by La

---

[7] Plaintiffs focus on the Company X accounts. Although it is not critical to my decision, it seems that some of the unauthorized accounts were unrelated to Company X. (*See* DSOMF ¶ 77) Unauthorized debit cards, too, seem to have been unrelated to Company X. (*See* DSOMF ¶¶ 54–60, 77) The falsification of time records, involving Lavine and La Paz, was unrelated to Company X. (*See* DSOMF ¶¶ 48–53.)

[8] This contention may be the plaintiffs' negative implication from the following deposition testimony:

> Q. In and of itself, three and over is grounds for termination automatically, right?
>
> A. It's grounds for termination, yes.

(King Dep. 54:20-22, ECF no. 51-27 at 15)

Paz that she had not recorded. Once again, the Bank was not required to excuse this kind of self-help. This kind of manipulation defeats the purpose of the system, which is to *monitor* employees' hours. That is why falsification of such records is prohibited by company policy. (*See* DSOMF ¶ 21.)

Before the Bank was credible evidence of serious infractions. To say that the Bank was precipitate, unfair, hypocritical, [9] or even mistaken as to the facts is not to say that the Bank discriminated on the basis of race. Selectivity may be inequitable, but unless exercised on a racial basis it is not actionable under NJLAD. A plaintiff cannot defeat summary judgment by showing that an employer's decision to terminate her was a bad decision. *Fuentes*, 32 F.3d at 765. NJLAD is not a vehicle for challenging employment decisions that are harsh, unfair, or inconsistent. *See Peper v. Princeton Univ. Bd. of Trs.*, 77 N.J. 55, 87 (1978) ("Anti-discrimination laws do not permit courts to make personnel decisions for employers. They simply require that an employer's personnel decisions be based on criteria other than those proscribed by law."). Evidence that an employer's "reason for firing [a plaintiff] was a mistake or an overreaction" does not imply that "it was a pretext for discrimination." *Klimek v. United Steelworkers Local 397*, 618 F. App'x 77, 80 (3d Cir. 2015).

Consistent with the NJLAD, "an employer can legally discharge an employee without violating employment discrimination statutes for good reason, bad reason, or no reason at all, as long as there is no intentional discrimination." *Maiorino v. Schering-Plough Corp.*, 302 N.J. Super. 323, 345 (App. Div. 1997) (internal quotation marks omitted); *see also Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385, 397 (1994). Hence, whether an employee's termination was "unfair to her" is "not the issue in a[n NJ]LAD claim." *Jason*, 329 N.J. Super. at 307-08. Nor is it determinative that a plaintiff believes she

---

[9] These events, by the way, preceded by some three years the 2016 revelation that Wells Fargo had opened millions of accounts without authorization. These local officials of the Bank, it seems, were justified, if precocious, in their concern; to date, Wells Fargo has paid customer compensation exceeding $10 million and regulatory fines of $185 million as a result of such practices. *See, e.g.,* http://fortune.com/2017/08/31/wells-fargo-increases-fake-account-estimate/.

"received a harsher punishment than her conduct warranted." *Klimek*, 618 F. App'x at 80. *See also id.* (observing that the Court is "not 'a super-personnel department' tasked with correcting unduly harsh employment actions").

In short, the basis for plaintiffs' firing, viewed in context, was not so flimsy that a fact finder could infer that racial discrimination must have been the real reason. Nor are there any more direct indicia of discrimination.

The second method (evidence that discrimination was a motivating factor) can be established by at least three kinds of proof: "by showing that the employer in the past had subjected [the employee] to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of her protected class more favorably, or that the employer has discriminated against other members of her protected class or other protected categories of persons." *Fuentes*, 32 F.3d at 765.

The plaintiffs offer no examples of prior discriminatory treatment— no racially charged remarks, no disparate treatment with respect to salaries or working conditions—indeed, no actions remotely of that kind.[10] (*See* DSOMF ¶¶ 109, 110, 112, 114) Indeed, they offer little beyond the statement that they "believed" the Bank's motive was racial discrimination. (PSOMF ¶ 8)

Nor is there any indication that the Bank treated employees of other racial/ethnic groups in disparate fashion. In evaluating such a claim, a court may consider whether comparator employees committed acts similar to those that led to the plaintiffs' termination, but were not terminated by the relevant decision maker. *See, e.g., Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142

---

[10] There is a special consideration in the case of Lavine. Anzalone—the person who executed the allegedly discriminatory firing—was the very person who had hired Lavine just two and one half years before. It is difficult to infer discriminatory intent under such circumstances. *See, e.g., Taylor v. Amcor Flexibles Inc.*, 669 F. Supp. 2d 501, 511 (D.N.J. 2009) ("Employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing") (internal quotation marks omitted), *aff'd*, 507 F. App'x 231 (3d Cir. 2012); *DeMary v. Kennedy Health Sys.*, No. 11-5984, 2014 WL 3748591, at *8 (D.N.J. July 30, 2014) (finding it "illogical" to conclude that a decisionmaker who hired and supervised plaintiff "suddenly decided ... to discriminate against Plaintiff because of her race").

13

F.3d 639, 645 (3d Cir. 1998); *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881-82 (3d Cir. 2011).

Four employees at the South Street branch, including the three plaintiffs, were implicated in the particular wrongdoing at issue here. All four, plaintiffs acknowledge, were fired simultaneously. (DSOMF ¶¶ 95–100, 111–13) *See Fernandez v. Costco Wholesale Corp.*, No. A-6466-06T1, 2009 WL 36440 (N.J. App. Div. Jan. 8, 2009) (no inference of discrimination where all employees involved in fraudulent coupon scheme were dismissed). The fourth employee, Bagley, was perceived as racially White by Lavine and Anzalone. (DSOMF ¶¶ 111, 115) In their summary judgment papers, plaintiffs state that Bagley is "of half Cuban descent." (PSOMF ¶ 8) Plaintiffs cite no evidence that Anzalone knew that, or acted on the basis of it.

Spreading their net wider, the plaintiffs point to the preceding year, 2012. Then, they say, Company X accounts had been opened by Ms. Firdaus. Firdaus, a supposedly "white-looking" Pakistani (PSOMF ¶ 3), was the person who reported the plaintiffs' wrongdoing to Anzalone. Firdaus was never deposed, however, and the facts were not developed. (ECF no. 62 at 3 ¶ 43). One possible basis for disparate treatment—that Firdaus reported wrongdoing to her superiors—suggests itself, but apparently it was not explored in discovery. Nor have the plaintiffs established that the decision maker in that hypothetical case of wrongdoing in 2012 would have been the same decision maker who fired plaintiffs. Nor have the plaintiffs established that any 2012 wrongdoing by Firdaus was reported or known to management at the time.

The record contains no history of similar discrimination against members of the plaintiffs' racial or ethnic group. Lavine acknowledged in her deposition that the South Street branch was like a "United Nations."[11] *See Lewis v.*

---

[11] I had a Russian. I had a Caucasian guy. I had two Dominicans. It was me and Sarah who was Pakistani. My teller line was pretty much the same. After a while, it got to be a more ethnic teller line, meaning that there were black tellers. There was an Asian teller and then there was one Caucasian on my teller line.

(DSOMF ¶116)

14

*Cablevision Sys. Corp.*, No. 08-2793, 2010 WL 1133872, at *8 (D.N.J. Mar. 22, 2010) (no inference of discrimination where employer had "a long record of hiring racially diverse candidates"); *Glover-Daniels v. 1526 Lombard St. SNF Operations LLC*, No. 11-5519, 2012 WL 2885935, at *11 (E.D. Pa. July 16, 2012) (employer's diverse workforce "cuts against an inference of discrimination").

Perhaps most significantly of all, these three dismissals *could not* have advanced any hypothetical agenda to reduce diversity or "purge[] the South Street Branch of persons of color (Latino and Black)." (Pl. Brf. 5) All three plaintiffs were replaced, and their replacements were of precisely the same racial/ethnic mix as the plaintiffs. Lavine was replaced as Manager by Ricardo Cruz, who is identified as Hispanic; La Paz and Mercado were replaced as Personal Bankers by Jonathan Charles and Norma Bowles, both identified as Black. (Facts ¶¶117-23.) To put it in the crudest terms, two Black employees and one Hispanic employee were replaced by two Black employees and one Hispanic employee. In short, the firing and replacement of these three plaintiffs did not alter the racial mix of the South Street branch one bit. *See, e.g., Geng v. PNC Fin. Servs. Grp., Inc.*, No. 13-0004, 2014 WL 3778299, at *10 (D.N.J. July 31, 2014) (granting employer's summary judgment motion where, after plaintiff's termination, "the overall racial diversity at the Lambertville Branch [of PNC Bank], as well as the fact that [plaintiff] Geng [an Asian] was replaced by another ethnic minority [an Hispanic], undercuts the inference of racial discrimination")

Viewed as a whole, in the light most favorable to plaintiffs, the record suggests at most that their dismissals were unfair or arbitrary. It does not establish, or even tend to establish, that these dismissals were discriminatory.

## CONCLUSION

For the reasons stated above, the motion for summary judgment of defendant Wells Fargo (ECF no. 51) is GRANTED, and the Complaint will be dismissed in its entirety, with prejudice. A separate order and judgment in favor of defendants is filed herewith.

Dated: October 27, 2017

*[signature]*

**KEVIN MCNULTY**
**United States District Judge**